Filed 10/4/16 (unmodified opn. attached)

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CITIZENS FOR CERES,<br><br>    Plaintiff and Appellant,<br><br>          v.<br><br>CITY OF CERES,<br><br>    Defendant and Respondent;<br><br>WAL-MART STORES, INC. et al.,<br><br>    Real Parties in Interest and Respondents. | F070988<br><br>(Super. Ct. No. 670117)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [INCLUDES CHANGE IN JUDGMENT]** |
| CITIZENS FOR CERES,<br><br>    Plaintiff and Respondent,<br><br>          v.<br><br>CITY OF CERES,<br><br>    Defendant and Respondent;<br><br>WAL-MART STORES, INC. et al.,<br><br>    Real Parties in Interest and Appellants. | F071600<br><br>(Super. Ct. No. 670117) |

**THE COURT:**

IT IS ORDERED that the request for modification of the opinion filed on September 28, 2016, by Wal-Mart Stores, Inc. and Wal-Mart Real Estate Business Trust is granted. Pursuant to California Rules of Court, rule 8.264(c)(1), the partially published

opinion filed in these consolidated appeals on September 12, 2016, is modified in the following particulars.  The page numbers in this order refer to the pagination of the slip opinion.

1.      On page 36, delete the last sentence of the disposition.  ("Respondents are awarded costs on appeal in both cases.")

2.      In place of that sentence, add the following:

Respondents are awarded costs in the merits appeal, case No. F070988.
Appellants are awarded costs in the costs appeal, case No. F071600.

Except for the modifications set forth above, the opinion previously filed remains unchanged.  The modifications include a change in the judgment.


Smith, J.

I CONCUR:


Poochigian, Acting P.J.

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CITIZENS FOR CERES, Plaintiff and Appellant, v. CITY OF CERES, Defendant and Respondent; WAL-MART STORES, INC. et al., Real Parties in Interest and Respondents. | F070988 (Super. Ct. No. 670117) **OPINION** |
| CITIZENS FOR CERES, Plaintiff and Respondent, v. CITY OF CERES, Defendant and Respondent; WAL-MART STORES, INC. et al., Real Parties in Interest and Appellants. | F071600 (Super. Ct. No. 670117) |

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I through V of the Discussion and the Concurrence.

APPEAL from a judgment of the Superior Court of Stanislaus County.  Roger M. Beauchesne, Judge.

Shore, McKinley & Conger, Brett S. Jolley and Aaron S. McKinney, for Plaintiff and Appellant in No. F070988, and for Plaintiff and Respondent in No. 71600.

Meyers, Nave, Riback, Silver & Wilson, Edward A. Grutzmacher, for Defendant and Respondent, City of Ceres.

K & L Gates, Edward P. Sangster and Daniel W. Fox for Real Parties in Interest and Respondents in No. 70988, and for Real Parties in Interest and Appellants in No. 71600.

-ooOoo-

After conducting an environmental review, the City of Ceres (city) approved the development of a shopping center anchored by a Wal-Mart Supercenter to replace an existing Wal-Mart store.  Citizens for Ceres (Citizens) filed a petition for a writ of mandate in the trial court pursuant to the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.[1]) (CEQA), alleging several defects in the environmental documents the city certified when it approved the project.  The trial court denied the petition and Citizens appeals.

Citizens makes four arguments:  (1) The environmental impact report (EIR) certified by the city did not mandate adequate mitigation measures for the urban decay impact of the project; (2) the EIR did not sufficiently analyze the project's impacts on landfill and recycling facilities and did not mandate adequate mitigation measures for those impacts; (3) the EIR failed to contain adequate information correlating the project's air pollution impacts with resulting effects on human health; and (4) the city's statement of overriding considerations, a document that explains how the project's benefits will

_____

[1]Subsequent statutory references are to the Public Resources Code unless otherwise noted.

2.

outweigh its significant and unavoidable environmental impacts, was not supported by substantial evidence. We reject each of these arguments.

After prevailing in the trial court, real parties in interest Wal-Mart Stores, Inc., and Wal-Mart Real Estate Business Trust (collectively Wal-Mart) filed a memorandum of costs in which they requested, among other things, an award against Citizens of $48,889.71 for the cost of preparing the administrative record. The city had incurred this cost by directing the record's preparation by outside counsel and Wal-Mart had reimbursed the city. Granting Citizens' motion to tax costs, the trial court struck this item from Wal-Mart's memorandum of costs. The court held that *Hayward Area Planning Assn. v. City of Hayward* (2005) 128 Cal.App.4th 176 (*Hayward Area Planning*) and section 21167.6, subdivision (b)(1) and (2), bar a real party in interest from recovering the cost of preparing the administrative record when a petitioner had requested a lead agency to prepare the record and had not consented to a real party's involvement in its preparation. In a separate appeal, Wal-Mart argues that this application of *Hayward Area Planning* was erroneous. We agree.

We affirm the trial court on the appeal by Citizens and reverse as to Wal-Mart's appeal on the cost of preparing the administrative record.[2]

### FACTS AND PROCEDURAL HISTORY

The project is a shopping center with about 300,000 square feet of retail space located at Mitchell Road and Service Road in Ceres. A building of about 190,000 square feet constitutes the first phase, to be occupied by a Wal-Mart store. This store will replace an existing Wal-Mart in Ceres. The new store will have nongrocery space comparable to the existing store, to which it will add a 56,000 square-foot grocery area.

---

[2]This is the second opinion we have issued in this case. The first, *Citizens for Ceres v. Superior Court* (2013) 217 Cal.App.4th 889 (*Citizens for Ceres I*), granted Citizens' petition for a writ of mandate regarding privilege claims erroneously sustained by the trial court in connection with the preparation of the administrative record.

The remainder of the project includes 10 additional buildings intended for smaller stores and restaurants. There is no specific timetable for the construction of any but the Wal-Mart portion of the project.

An application for the necessary land-use approvals was submitted to the city on February 16, 2007, by an entity called Regency Centers. Wal-Mart bought the land from Regency Centers in 2009 and became the project applicant.

The city issued a notice of preparation of the EIR on September 5, 2007. It released the draft EIR on May 19, 2010, and announced a 45-day public-comment period. The final EIR, including responses to comments, was issued on February 2, 2011. The city's planning commission held public hearings on February 22 and April 4, 2011, and voted to certify the final EIR.

The city's procedures provided for a process referred to as an appeal, in which the city council would review the planning commission's decision. Citizens filed such an appeal, leading to public hearings before the city council on May 23, August 22, and September 12, 2011. The city council upheld the planning commission's decision and again certified the final EIR. The city issued a notice of determination on September 13, 2011, stating that it had certified the EIR. The land-use approvals granted included a conditional use permit and a vesting tentative subdivision map.[3]

Citizens filed its writ petition in the trial court on October 12, 2011. The petition advanced the claims Citizens advances in this appeal, among others.

---

[3]A conditional use permit authorizes a land use that, under a zoning ordinance, is allowed only when certain conditions are met. (*Neighbors in Support of Appropriate Land Use v. County of Tuolumne* (2007) 157 Cal.App.4th 997, 1006.) A vesting tentative subdivision map authorizes a developer to proceed with development in accordance with local laws in effect at the time of application for the map, thus avoiding the potential for frustration of the project by later enactments. (*City of West Hollywood v. Beverly Towers, Inc.* (1991) 52 Cal.3d 1184, 1193, fn. 6.)

While the writ petition was pending, a dispute developed between the parties over the city's claim that all communications between the city and Wal-Mart were privileged. The city refused to disclose these communications and did not include them in the administrative record it prepared for purposes of the writ proceedings in the trial court. (*Citizens for Ceres I, supra*, 217 Cal.App.4th at pp. 899-900.) The trial court upheld the privilege claims, and Citizens filed a writ petition in this court. (*Id.* at p. 905.) In our opinion filed on July 8, 2013, we held that, for all communications preceding project approval and passing between the city and Wal-Mart, privileges were waived by disclosure and the common-interest doctrine did not apply. (*Id.* at pp. 898, 914.)

The case then proceeded in the trial court, and Citizens' petition on the merits was heard and taken under submission on July 11, 2014. The court rejected all of Citizens' claims and denied relief in a statement of decision filed on November 3, 2014. Judgment was entered on November 25, 2014.

Wal-Mart filed its memorandum of costs in the trial court on December 17, 2014. It requested $49,284.71 in costs. Of this, $395 was for filing fees and $48,889.71 was for "[o]ther." The "[o]ther" costs, which are at issue in this appeal, were broken down as follows: original administrative record, $34,981.84; supplemental administrative records, $12,258.87; and privilege log, $1,649.

Citizens had requested pursuant to section 21167.6 that the city prepare the administrative record, and the city had directed its outside counsel to carry out the preparation. When Wal-Mart became the project applicant, it became successor to an agreement between the city and the prior applicant; this agreement included the project applicant's promise to reimburse the city for all expenses arising from legal challenges to the project. Wal-Mart paid the city $48,889.71 for costs of preparing the administrative record.

Citizens responded to Wal-Mart's memorandum of costs by filing a motion to tax costs, in which it challenged the $48,889.71 claim. Citizens' motion argued that,

5.

although the city, as the lead agency, could have recovered the cost of preparing the record under section 21167.6, Wal-Mart could not.  The trial court agreed.

## *DISCUSSION*

### I.        *Standards of review and substantive legal standards under CEQA*

If a CEQA petition challenges agency action that is quasi-adjudicatory in character, the trial court's role is only to determine whether the action is supported by substantial evidence in the record.  (§ 21168.)  If the agency action was quasi-legislative in character, the trial court reviews the action for abuse of discretion.  The agency abuses its discretion if it does not proceed in the manner required by law or if the decision is not supported by substantial evidence.  (§ 21168.5.)  "'Substantial evidence'" is defined in the Guidelines as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (§ 15384, subd. (a), Guidelines for the Implementation of the California Environmental Quality Act (Cal. Code Regs., tit. 14, § 15000 et seq.) (Guidelines).)  The formulations in sections 21168 and 21168.5 embody essentially the same standard of review.  Both require the trial court to determine whether the agency acted in a manner contrary to law and whether its determinations were supported by substantial evidence, and neither permits the court to make its own factual findings.  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392, fn. 5; *Burbank-Glendale-Pasadena Airport Authority v. Hensler* (1991) 233 Cal.App.3d 577, 589-590.)  The Court of Appeal reviews the trial court's decision de novo, applying the same standards to the agency's action as the trial court applies.  (*Neighbors of Cavitt Ranch v. County of Placer* (2003) 106 Cal.App.4th 1092, 1100.)

The EIR has often been called the heart of CEQA, functioning both to disclose the environmental impacts of a proposed project before it can be approved and to identify measures to mitigate the impacts, measures which must be imposed if feasible.

6.

(*Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 706 (*Woodward Park Homeowners*).)  An EIR must include discussion of a possible environmental impact if substantial evidence in the administrative record supports a fair argument that the impact will be significant.  (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1109 (*Amador Waterways*).) Having considered all such possible impacts, the EIR then must "identify and focus on" those that will in fact be significant.  (Guidelines, § 15126.2, subd. (a).)  If the agency has determined that a possible impact will not be significant, the EIR must make a finding to that effect.  (Guidelines, § 15128.)  The EIR also must describe and impose feasible mitigation measures, if any exist, that could minimize significant impacts.  (Guidelines, § 15126.4, subd. (a)(1).)  If more than one mitigation measure is available, the EIR must discuss each and describe reasons for the measure or measures it selects.  (Guidelines, § 15126.4, subd. (a)(1)(B).)  If no mitigation measures are feasible, the EIR must say so. (Guidelines, § 15091, subd. (a)(3).)  An EIR can find that the feasible measures available to avoid or mitigate a significant impact are within the jurisdiction of another agency that has adopted them or can and should adopt them.  (Guidelines, § 15091, subd. (a)(2).)  In any event, the EIR's findings must be supported by substantial evidence.  (§ 21081.5.)

An agency is forbidden to approve a project unless it finds there are no significant impacts, or imposes mitigation measures to reduce all significant impacts to an insignificant level, or finds feasible mitigation measures are not available to reduce all significant impacts to an insignificant level, or finds feasible mitigation measures are within the jurisdiction of another agency.  (§ 21081, subd. (a); Guidelines, § 15091, subd. (a).)  If the EIR finds there are significant impacts that cannot feasibly be mitigated to an insignificant level, it must reject the project or adopt a statement of overriding considerations when approving it.  (§ 21081, subd. (b); Guidelines, § 15093.)

## II.    *Urban decay*

Urban decay can be a significant environmental impact of a project under CEQA. In the CEQA context, urban decay can include physical deterioration of buildings and property as a result of the economic effects of a project, but it does not include those economic effects themselves. For instance, if a retail project is expected to lead to closures of competing businesses, the resulting dilapidation of those businesses' premises can be deemed a significant environmental impact of the project under CEQA, but not the business closures themselves. (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1204-1207 (*Bakersfield Citizens*); Guidelines, §§ 15064, subd. (e), 15131, subd. (a).)

In this case, the EIR discussed the possibility of an urban decay impact on one building: the old Wal-Mart that will be closing when the new one opens. "Closure of this store represents a substantial increase in the amount of vacant retail inventory, and the space may prove difficult to re-tenant, especially in the short term," the EIR stated. For these reasons, "[t]his property presents the potential for urban decay, depending on the property owner's ability to find a new tenant and the City's willingness and ability to enforce ordinances regarding upkeep of the physical property .…"

The EIR then discussed chapter No. 9.40 of the Ceres Municipal Code, which "contains numerous restrictions and standards for the maintenance of vacant buildings to avoid public nuisances such as blight, and to protect surrounding property values." The ordinance requires trash removal, pest control, and maintenance of building exteriors and landscaping. To cover the cost of monitoring and enforcement by the city, the ordinance requires owners of vacant buildings to pay a fee.

The EIR found, however, that the ordinance might not "sufficiently minimize the potential for blight and urban decay" because of "the size and nature of the building." Consequently, it imposed mitigation measure No. 4.5.1, which required "the property owner" to "enter into a supplemental maintenance agreement with the City to ensure

8.

property maintenance until the site is reoccupied, and whereby the City will be compensated (via bond or otherwise) for abatement of visual indications of blight on the property if and when the property owner fails to adequately maintain the property in good condition and abate elements of deterioration .…" With this mitigation measure, the EIR concluded that the project's urban decay impact would be less than significant.

The EIR also stated that there was a risk that one of Ceres's five supermarkets would be forced out of business by the grocery section of the new Wal-Mart. It found that the most vulnerable store was Richland Market, 1.5 miles away from the new Wal-Mart site. The EIR did not include any mitigation measures for the maintenance of any supermarket that might close because of the project.

The EIR's findings about a possible supermarket closure were based on a report prepared by Bay Area Economics, a firm of consultants retained by the city. This report included a finding that a downward trend in housing construction had developed in Ceres after the financial crisis of 2008. Because of this trend, the vacancy of any supermarket that closed because of the project could be a long-term vacancy, which in turn could lead to vacancies of smaller stores in the supermarket's shopping center. The center as a whole then could deteriorate physically. Ceres at the time had few vacant commercial properties, however, and these did not exhibit signs of decay.

Citizens submitted a report by economist Jim Watt to rebut the Bay Area Economics report. Watt's report included opinions that the Bay Area Economics report was too optimistic and was based on unrealistic projections of economic growth and population growth. It stated that one supermarket had already closed, partly in anticipation of competition from the new Wal-Mart, and that two more supermarkets and a K-Mart were at risk. Because of a weak commercial leasing sector, large stores that became vacant were likely to remain so for a long time. Some properties in the city already showed signs of decay, a matter overlooked by the EIR, according to Watt.

9.

In its resolution certifying the EIR, the city added findings to give further support to the EIR's findings about urban decay. The resolution stated that Richland Market was located in a shopping center with a "strong second anchor," Richland Ace Hardware. Further, it was in a good location for serving a residential neighborhood and was likely to attract a different category of tenants than those that would be drawn to the new Wal-Mart center. The city as a whole had few vacant retail spaces. Finally, the resolution cited the city's anti-blight regulations: "[I]n the event the supermarket does close, existing City ordinances would require that the building be maintained while the building is vacant."

In Citizens' view, the EIR either should have found, or effectively did find, that the potential for a supermarket closure or closures (with the attendant possible property deterioration) was a significant environmental impact. Because the EIR did not include any mitigation measure for that impact, Citizens says the EIR could not properly conclude that the project's urban decay impacts would be mitigated to an insignificant level.

We disagree. Under the substantial evidence standard, the question is only whether a reasonable fact finder could make the findings the city made, not whether contrary findings could have been upheld. (Guidelines, § 15384, subd. (a).) On this record, the city could reasonably find as it did: The old Wal-Mart building was too large for the city to cope with under its antiblight ordinance, so mitigation was required to avoid decay at that location; but the remaining vacancy potential was limited and was within the city's capabilities under the ordinance.

Citizens also argues that, in addition to failing to be supported by substantial evidence, the EIR's treatment of urban decay means the city "has not proceeded in a manner required by law ...." (§ 21168.5.) By this, Citizens means the city acknowledged a significant impact but then refused to require mitigation of it. In reality, this argument boils down to a repetition of Citizens' substantial evidence argument. The

10.

city can be deemed to have refused to require mitigation of a significant urban decay impact on stores other than the old Wal-Mart only if substantial evidence fails to support the finding that the city's antiblight regulations are up to the task of coping with the likely vacancies. We have already rejected this argument.

Citizens next cites *California Clean Energy Committee v. City of Woodland* (2014) 225 Cal.App.4th 173. In that case, the EIR for a shopping center project included several mitigation measures addressing the project's urban decay impact on the city's downtown and other areas. The EIR concluded that, even with these mitigation measures, the project's urban decay impact would remain significant and unavoidable. (*Id.* at pp. 182, 185, 189-190.) The Court of Appeal analyzed the mitigation measures and found them insufficient. These measures called for the future creation of studies and plans regarding the project's urban decay impacts, but did not mandate that any action be taken based on the studies and plans. The lack of any action—even any projected future action based on studies yet to be undertaken—meant these were not proper mitigation measures under CEQA. (*California Clean Energy Committee, supra,* at pp. 193-200.)

The present case is not similar. The agreement mandated by mitigation measure No. 4.5.1 is an agreement to maintain property, not a study or a plan unconnected with any commitment to take action.

A passing reference in Citizens' opening brief to the "deferring" of mitigation measures perhaps suggests that, because the maintenance agreement was to be executed after rather than before the project's approval, it violates Guidelines section 15126.4, subdivision (a)(1)(B): "Formulation of mitigation measures should not be deferred until some future time." If so, Citizens has forfeited the point by failing to develop it. (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 366, fn. 2; *Nielsen v. Gibson* (2009) 178 Cal.App.4th 318, 324.) There is additional discussion of the notion of deferred mitigation in Citizens' reply brief, but this comes too late. Just as a court need not address a point raised for the first time in a reply

11.

brief (*People v. Tully* (2012) 54 Cal.4th 952, 1075), we will not deploy against a respondent an argument mentioned but not developed in an appellant's opening brief and then made clear for the first time in the reply brief.

For all these reasons, we reject Citizens' contention that the analysis and mitigation of urban decay impacts in the EIR were insufficient.

## III.   *Solid waste*

The EIR's section on solid waste explained that, according to the checklist in appendix G of the Guidelines, a project should "[b]e served by a landfill with sufficient permitted capacity to accommodate the project's solid waste disposal needs" and "[c]omply with federal, state, and local statutes and regulations related to solid waste." The EIR adopted these suggestions as the standards by which it judged whether the project's solid waste impacts would be significant. That is, the project's solid waste generation would be deemed not to have a significant impact on the environment if the project was served by a landfill with sufficient permitted capacity and complied with regulations.

Based on data about the types and quantities of retail uses to which the project was expected to be devoted, the EIR projected the quantity of solid waste the project would generate. It stated that, when the entire shopping center was complete, it would produce about 1,100 tons of solid waste per year or 2.97 tons per day.

The EIR stated that the project would be served by the county's landfill on Fink Road. This landfill had a permitted maximum disposal rate of 1,500 tons per day (about 550,000 tons per year) and was actually receiving 409 tons per day (about 150,000 tons per year). The project's output of 2.97 tons per day (about 1,100 per year) "would not result in a substantial contribution" to the landfill. Consequently, the project's environmental impact from solid waste generation would not be significant and no mitigation was necessary.

12.

The EIR acknowledged that the Fink Road landfill was expected to reach its capacity and close in 2021. The county was "pursuing a permit change that would increase the capacity" (italics omitted) and allow the landfill to continue operating for a period to be determined by the permitting agency, "which could be anywhere from 5 to 15 years." (Italics omitted.) Further, the county had "purchased and set aside land for a new landfill," but would seek a permit for a new landfill only if it failed to obtain an extended permit for the Fink Road landfill. This new landfill was expected to have 20 years of capacity in its first phase and an additional 60 years of capacity in its second phase.

In a separate section on the project's cumulative solid waste impact (i.e., its impact considered in the context of increases in solid waste output from other projects), the EIR noted that Ceres shared the Fink Road landfill with surrounding communities. It further stated that a specified group of projects—some seeking approval, some approved, and some under construction—"will increase demands placed on the City's solid waste disposal and landfill facilities." The EIR then repeated the above facts regarding expanding or replacing the Fink Road landfill and noted that the cost of expanding or replacing the landfill was built into the tipping fees charged for dumping refuse there. Without undertaking a quantitative analysis of the solid waste impacts of the listed projects, the EIR concluded that the project's solid waste impact was "less than cumulatively considerable." (Bolding omitted.)

Citizens' response to the draft EIR included a report by Curtis Fujii, an engineer. Fujii opined that the EIR contained insufficient information to support its significance findings regarding solid waste impacts. Among other things, the EIR did not contain a sufficient explanation of how the project's waste will be disposed of when the county's current landfill permit expires in 2021, what impact the project will have on recycling facilities, and what the waste disposal consequences will be of Wal-Mart's use of packaging made from polylactic acid, known as PLA or corn plastic (PLA). The city

13.

responded to Fujii's comments, and Citizens submitted a second report by Fujii opining that the city's responses were insufficient.

Citizens makes three arguments: (1) because the only presently existing, permitted landfill will reach its capacity in a few years, substantial evidence does not support the EIR's finding that the project's solid waste impact will be insignificant; (2) the EIR was required, but failed, to discuss the project's impact on recycling facilities, including the impact arising from disposal of PLA packaging; and (3) the EIR's discussion of the project's cumulative solid waste impact is inadequate because it includes no quantitative discussion of other projects' incremental contributions to the waste stream. We will consider these in turn.

### A. *Landfill capacity*

Citizens' notion about landfill capacity is that when the Guidelines' appendix G suggests a project's solid waste impact is significant unless the project is "served by a landfill with sufficient permitted capacity to accommodate the project's solid waste disposal needs" (Guidelines, appen. G, part XVII(f)), it means there must be permitted capacity to accept the project's waste for the life of the project or some similarly lengthy period of time. The argument fails because Citizens presents no foundation in authority or logic for it.

For two projects having the same solid waste output and alike in other respects, one might be situated in an area served by a new landfill with decades of remaining capacity while the other might be in a place with an old landfill soon to be filled. The second project has a potential to cause a significant impact that the first project lacks: It could find itself with nowhere to send its waste in the short term. But this is, of course, not necessarily what will happen. The authorities in the project's jurisdiction might have adequate plans in place for coping with the expiring landfill capacity.

This is precisely what happened in this case. The EIR's finding of sufficient future capacity—and thus of no significant impact—was based on evidence that the local

14.

authorities had reasonable contingency plans in place. They had applied for a 5-to-15-year extension of the Fink Road landfill permit and had acquired land able to support a landfill with 20 to 80 years' further capacity. This was sufficient.

Citizens says this case is similar to the so-called paper water cases. Paper water, in the CEQA case law, is future water availability based on figures representing the once-promised delivery capacity of the State Water Project. The trouble with paper water from the CEQA perspective is that the State Water Project has never actually had that capacity and, despite the hopes of its designers, is today not expected ever to have it. Paper water cannot be an adequate basis for a water supply analysis in an EIR because it will never exist. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 432; *Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 914, fn. 7.) The present case is not similar. Nothing in the record supports the supposition that Stanislaus County's landfill plans are illusory. Citizens cites Fujii's second report, which attempted to cast doubt on those plans by saying there is no such thing as "a 'slam dunk' permit for either a landfill expansion or a new landfill." A slam dunk is not necessary, however. Even the cases rejecting paper water do not require certainty. (*Vineyard Area Citizens, supra*, at p. 432.)

### B.      *Recycling*

The EIR's section on solid waste describes the city's recycling arrangements under the heading "Existing Conditions." It reports that the city has a contract for solid waste and recycling services with Bertolotti Transfer and Recycling Center, which has its recycling facility a few miles from the project site, with a maximum permitted capacity of 750 tons per day. The EIR does not include any discussion of the project's output of recyclable waste as an environmental impact.

Fujii's first report included a discussion of recycling. Citing data showing that 61 percent of the county's solid waste was diverted to recycling facilities, Fujii opined that the EIR's solid waste analysis was incomplete because it did not examine the project's

impact on recycling facilities. The EIR also should have included a specific discussion of the handling of PLA plastic packaging, according to Fujii. Fujii cited public statements by Wal-Mart that it had begun using this packaging instead of conventional plastic for produce and other items. Fujii explained that PLA plastic is biodegradable and can be composted but cannot be recycled along with ordinary plastic. When consumers place PLA packaging in their recycling bins, recycling facilities are forced to expend resources separating the PLA items from the recyclable items. Fujii quoted a "report prepared for the California Integrated Waste Management Board" according to which, "'degradable plastics could … contaminate the existing plastic recycling stream if they are not properly collected and composted, thus reducing plastic recycling opportunities.'" This problem could, in turn, impair the region's ability to comply with recycling mandates imposed by state law.

City staff prepared a memorandum that included a response to the first Fujii report. Among other things, it explained that PLA was already in the waste stream. Because the county had no composting program, it sent PLA waste to the landfill. Residents were instructed to place PLA waste in their recycling bins along with other plastics for curbside pickup; the PLA items were sorted out later. The administrative record also includes a city planning document prepared in 2008 saying the city and Bertolotti Transfer and Recycling Center "do not currently foresee any service issues within the next 20 years." Fujii's second report criticized the city for not providing details on how the additional burden of sorting PLA would impact the recycling facility or what the impacts would be of transporting additional PLA to the landfill.

Citizens presses the recycling and PLA arguments again now. We apply the fair argument standard mentioned above when we review a claim that an EIR improperly failed to discuss an impact. If substantial evidence in the record supports a fair argument that the impact in question is significant, the EIR must analyze the impact. (*Amador*

16.

*Waterways, supra,* 116 Cal.App.4th at p. 1109.) As we will explain, Citizens' position fails under this standard.

Citizens has cited no authority for the view that if a project will generate recyclable waste, this is always an environmental impact that must be reviewed in an EIR. It may seem anomalous that EIR's are expected to analyze the impact of nonrecyclable waste on landfills but not necessarily the impact of recyclable waste on recycling facilities. In our view, however, the distinction is logical. Unlike traditional waste disposal methods, such as landfilling, recycling is not itself an environmental problem, but is instead a solution to the problems presented by those traditional methods. The California Integrated Waste Management Act (§ 40000 et seq.) (CIWMA) is premised on this idea. The Legislature found that 90 percent of the state's solid waste was disposed of in landfills; that some landfills threatened groundwater, air quality and public health; and that landfill space would run out without measures to promote recycling, reduction, and reuse. (§ 40000, subds. (b), (c), (e).) CIWMA mandated that local governments implement waste management plans under which they would divert waste from landfills by means of recycling, composting, and source reduction. (§§ 41750, 41780.) Further, unlike a landfill, which merely accumulates waste and eventually can take no more, a recycling facility processes and sells a product. For these reasons, we agree with Wal-Mart and the city that when a project will result in increased demand for recycling services, this often can be treated as an economic rather than an environmental impact and need not be analyzed in the EIR.

Of course, in some cases a project might be expected to produce a quantity of recyclable waste sufficient to overwhelm the available facilities, leading to the landfilling of recyclables and possibly the failure of a local government to meet its obligations under CIWMA. Then the project could be deemed to have a significant environmental impact because of its production of recyclable waste. There is no evidence of that problem here. The facts on which Citizens relies are simply that some portion of the solid waste

17.

produced by the project will be recyclable, and the quantity of recyclable waste produced will presumably be greater than the quantity produced by the old Wal-Mart. This is substantial evidence that the project will cause an increase in recycling; but as we have explained, an increase in recycling in itself is not an adverse environmental impact. It is *not* substantial evidence that the increase may be more than the city's recycling contractor can handle. For that reason, it does not support a fair argument that there is a significant impact needing discussion in the EIR.

PLA waste potentially presents a scenario in which recycling services could be interfered with.[4] Because of the sorting problem (PLA products cannot be recycled with other plastic and must instead be separated and either composted or landfilled), a major increase in PLA waste from a proposed project could conceivably lead to a reduction in recycling and an increase in landfilling. There is no evidence of this type of problem in this case, however. The evidence showed only that PLA was already in the waste stream, the city's recycling contractor was already managing the extra sorting involved, and the city and contractor saw no capacity problems with recycling for the next 20 years. In light of this, the mere fact that the project would result in increased PLA waste output compared with the old Wal-Mart was not substantial evidence sufficient to support a fair argument that there would be a significant environmental impact.

### C.    *Cumulative impacts*

For the purpose of discussing certain cumulative environmental impacts of the project, the EIR included a table of pending and recently approved projects in Ceres and adjacent areas in Stanislaus County. The table showed a variety of residential and

---

[4]The city and Wal-Mart argue that Citizens failed to exhaust its administrative remedies on this issue because it did not raise it until after the *planning commission* had certified the EIR. Citizens argues that it did exhaust its administrative remedies because it raised the issue before the *city council* certified the EIR. We will assume for the sake of argument that Citizens is correct.

18.

commercial projects at various stages, some under environmental review, some approved, and some under construction. The EIR's section on cumulative solid waste impacts remarks that these projects, if built, together with other foreseeable development in the area, "will increase demands placed on the City's solid waste disposal and landfill facilities."

The EIR then analyzes the cumulative solid waste impact of this expected growth as follows:

> "As indicated …, the proposed project is anticipated to generate substantial amounts of solid waste. However, the proposed project will be served in the near term by the Fink Road Landfill, which has adequate daily capacity to handle the waste generation from the proposed project.
>
> "In the cumulative condition, the Fink Road Landfill has capacity to operate until the year 2021. The County is pursuing a permit change that would increase the capacity at the Fink Road [L]andfill on the current plan within the same footprint. This permit change is currently in the CEQA process. The term of the increased landfill capacity will be determined by what is allowed by the permitting agency which could be anywhere from 5 to 15 years. The County has purchased and set aside land for a new landfill but will not be seeking a permit unless the Fink Road Landfill is not permitted to expand.
>
> "The county operates the landfill as an enterprise account meaning that the costs of replacing the landfill are included in the tipping (dumping) fees. The tipping fees are revised periodically to meet the needs of the landfill including changes to regulations and the need to expand or replace the facilities. All contributors to the landfill are charged the tipping fee. The tipping fee was increased from $30.00/ton to $33.00/ton in July of 2009. As the proposed project will be served by an existing landfill that has adequate capacity until 2021 and [the county] is pursuing [a] permit for more capacity for at least the next 5-15 years, this impact is less than cumulatively considerable."

Fujii, Citizens' engineering consultant, wrote that he had calculated the likely solid waste output of the projects in the EIR's table and determined that it would equal around 4,054 tons per year (about 11 tons per day), about four times the output of the Wal-Mart project. Fujii also opined that the table was incomplete, since it did not include

19.

projects in a number of areas that were served by the Fink Road landfill. He mentioned several projects in those areas and calculated that their solid waste output was about 4,100 tons per year (also about 11 tons per day). Citizens argues that the EIR's discussion of cumulative solid waste impacts was inadequate because it did not specifically discuss the disposal of these 22 tons per day of waste.

The purpose of the requirement to consider cumulative impacts is to avoid carrying out the environmental review of a project "in a vacuum," since "[o]ne of the most important environmental lessons that has been learned is that environmental damage often occurs incrementally from a variety of small sources. These sources appear insignificant when considered individually, but assume threatening dimensions when considered collectively with other sources with which they interact." (*Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 114, overruled on other grounds by *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1109, fn. 3.) "[C]onsideration of the effects of a project or projects as if no others existed would encourage the piecemeal approval of several projects that, taken together, could overwhelm the natural environment and disastrously overburden the man-made infrastructure and vital community services." (*Las Virgenes Homeowners Federation, Inc. v. County of Los Angeles* (1986) 177 Cal.App.3d 300, 306.)

The following are provisions of the Guidelines dealing with cumulative impacts:

"'Cumulative impacts' refer to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts.

"(a) The individual effects may be changes resulting from a single project or a number of separate projects.

"(b) The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects. Cumulative impacts can result from individually

20.

minor but collectively significant projects taking place over a period of time." (Guidelines, § 15355.)

"(a) An EIR shall discuss cumulative impacts of a project when the project's incremental effect is cumulatively considerable, as defined in section 15065(a)(3). Where a lead agency is examining a project with an incremental effect that is not 'cumulatively considerable,' a lead agency need not consider that effect significant, but shall briefly describe its basis for concluding that the incremental effect is not cumulatively considerable. [¶] … [¶]

"(2) When the combined cumulative impact associated with the project's incremental effect and the effects of other projects is not significant, the EIR shall briefly indicate why the cumulative impact is not significant and is not discussed in further detail in the EIR. A lead agency shall identify facts and analysis supporting the lead agency's conclusion that the cumulative impact is less than significant." (Guidelines, § 15130, subd. (a).)

"'Cumulatively considerable' means that the incremental effects of an individual project are significant when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (Guidelines, § 15065, subd. (a)(3).)

The EIR's discussion was adequate under these standards. The EIR says the project's individual solid waste impact is not significant if the county has landfill capacity sufficient to serve it. Extending this method of analysis to cumulative impacts, the EIR would view the project's solid waste impact as cumulatively considerable if it and the other projects taken together would overwhelm the available landfill capacity. Substantial evidence supported the finding that they would not.

The EIR cited evidence that the Fink Road landfill had capacity of 1,500 tons per day and actually received 409 tons per day. The project's contribution would be slightly less than three tons per day. Assuming Fujii's calculations were correct, the other projects listed in the EIR would contribute an additional 11 tons per day, plus about 11 more tons from the projects Fujii mentioned that were not listed in the EIR. The landfill was projected to reach its permitted capacity in 2021, with 5 to 15 years of additional permitted capacity having been applied for and 20 to 80 years of capacity beyond that in

21.

a new landfill to be sited on land the county had acquired. In light of all this, the city could reasonably find that the cumulative effect of all these projects would not overwhelm the county's landfill capacity and thus that the project's effect was not cumulatively considerable.

The finding that the impact would not be cumulatively considerable authorized the city to omit an extensive cumulative-impact discussion. The city was required only to "briefly describe its basis" for finding no cumulatively considerable impact and to "briefly indicate why the cumulative impact is not significant and is not discussed in further detail in the EIR." (Guidelines, § 15130, subd. (a)(2).) The brief indication should "identify facts and analysis" supporting the conclusion that there is no significant cumulative impact. (*Ibid*.) The EIR's discussion was adequate under this standard. It acknowledged that foreseeable growth would place cumulative demands on the landfill but projected that the landfill would not reach capacity until 2021 under the existing permit and stated that a permit extension for 5 to 15 years was in process. Further, the landfill's fee structure was designed to cover the costs of expanding and replacing the landfill when necessary, in accordance with the actual amount of waste dumped.

## IV. *Health effects of air pollution*

The EIR explained that its standards for determining whether the project's emissions of air pollutants would cause a significant impact were based on appendix G of the Guidelines. Among other things, these standards required a finding of a significant impact if the project's emissions would result in a violation of any air quality standard or would cause a cumulatively considerable increase in any pollutant for which the project's region was in nonattainment status under state or federal standards. For several possible impacts related to the project's construction and operation, the EIR found there would be emissions of regulated pollutants, but these would be less than significant either with or without mitigation. The main source of pollutants from the operation of the project would be vehicle emissions from customers' cars and delivery trucks. For all the

22.

potential air pollution impacts of the project considered individually (rather than cumulatively), the EIR found no significant impact.

The EIR did find that the project's air pollutant emissions would be cumulatively considerable and the cumulative impact could not be mitigated to an insignificant level. It explained that a significant cumulative impact, as defined in CEQA, can result from an aggregation of impacts not individually significant. If a project's emissions would result in a cumulatively considerable net increase in a pollutant for which the region is in nonattainment status, then its cumulative impact would be significant. Compliance with the regulations of the San Joaquin Valley Air Pollution Control District would cause a net reduction in the project's emissions of oxides of nitrogen ($NO_x$) and 10-micron particulate matter ($PM_{10}$), which are nonattainment pollutants, but it would not eliminate these, and additional mitigation would not be feasible. The remaining emissions would contribute to significant and unavoidable cumulative impact.

For the cumulative impact, the pollutants at issue were $NO_x$ and $PM_{10}$. In a section describing properties of air pollutants, the EIR contains the following remarks on $NO_x$ and particulate matter (which includes $PM_{10}$ and $PM_{2.5}$):

> "Health effects associated with $NO_x$ are an increase in the incidence of chronic bronchitis and lung irritation. Chronic exposure to $NO_2$ [one of the oxides of nitrogen] may lead to eye and mucous membrane aggravation, along with pulmonary dysfunction.… [¶] … [¶]
>
> "Acute and chronic health effects associated with high particulate levels include the aggravation of chronic respiratory diseases, heart and lung disease, and coughing, bronchitis, and respiratory illnesses in children. Recent mortality studies have shown a statistically significant direct association between mortality and daily concentrations of particulate matter in the air.…"

The EIR also includes a discussion of the health effects of ozone. Ozone is formed in the atmosphere from compounds known as ozone precursors. Oxides of nitrogen are ozone precursors:

"While ozone in the upper atmosphere protects the earth from harmful ultraviolet radiation, high concentrations of ground-level ozone can adversely affect the human respiratory system. Many respiratory ailments, as well as cardiovascular disease, are aggravated by exposure to high ozone levels.…"

Citizens argues that the discussion of air pollution impacts is insufficient and constitutes a failure to proceed according to the law because it does not "correlate the adverse air quality impacts to resultant adverse health effects."[5]

In support of its position, Citizens relies on *Bakersfield Citizens, supra,* 124 Cal.App.4th 1184.[6] In that case, two EIR's found that projects would have significant, unavoidable air quality impacts. Both would have such impacts individually and one would also do so cumulatively. The Court of Appeal agreed with a challenger's assertion that the EIR's omitted required information when they "failed to correlate the identified adverse air quality impacts to resultant adverse health effects." The court cited Guidelines section 15126.2, subdivision (a), which provides that an EIR should discuss "'health and safety problems caused by the physical changes'" in the environment arising from a project's significant impacts. (*Bakersfield Citizens, supra,* at p. 1219.) The court stated:

> "[N]either EIR acknowledges the health consequences that necessarily result from the identified adverse air quality impacts. Buried in the description of some of the various substances that make up the soup known as 'air pollution' are brief references to respiratory illnesses. However, there is no acknowledgement or analysis of the well-known connection

[5]As a threshold matter, the city and Wal-Mart argue that Citizens failed to exhaust its administrative remedies on this issue because it placed the issue before the city council only in the form of a reference to the matter within a proposed draft resolution. Citizens argues that the discussion in the proposed draft resolution sufficed to bring the issue to the city's attention. We will assume for the sake of argument that Citizens is correct.

[6]The California Supreme Court has granted review in a case involving the discussion in an EIR of the correlation between health problems and a project's air quality impacts, as required by *Bakersfield Citizens.* (*Sierra Club v. County of Fresno* (2014) 226 Cal.App.4th 704, review granted Oct. 1, 2014, S219783.)

between reduction in air quality and increases in specific respiratory conditions and illnesses. After reading the EIR's, the public would have no idea of the health consequences that result when more pollutants are added to a nonattainment basin. On remand, the health impacts resulting from the adverse air quality impacts must be identified and analyzed in the new EIR's." (*Bakersfield Citizens, supra*, 124 Cal.App.4th at p. 1220.)

Citizens does not make clear what additional discussion it believes the EIR should have contained. It suggests the EIR should have disclosed "the incremental correlation between the increase in pollution and the increased risk of health problems it causes." This could mean the EIR should have said how many additional cases of each potential illness the increase in pollutants will cause, how many days of nonattainment will be added per year by the project's pollutants, how much the concentration of these pollutants in the air will increase, or something similar.

In our view, *Bakersfield Citizens* does not require this type of quantitative correlation between air pollution emissions and health effects in *this* case. The two projects at issue in *Bakersfield Citizens* both had significant *individual* impacts. It might reasonably be supposed that the proponents of a project are capable of quantifying the health effects of the air pollution emissions of the project itself, at the individual level. Here, however, the only significant impact found was the *cumulative* impact; and this was not the sort of cumulative impact that could meaningfully be quantified. The finding of a significant cumulative impact was based on the assumptions that "numerous projects will be under construction simultaneously with the proposed project throughout the air basin" and these projects would result in significant and unavoidable impacts. The number of other projects and the extent of their air pollution emissions was unknown. We do not think the EIR could reasonably be expected to quantify the health effects of the project's (individually insignificant) contribution to the cumulative impact under these circumstances.

We need not reach any conclusions about the applicability of *Bakersfield Citizens* or Guidelines section 15126.2, subdivision (a), to cumulative impacts in general. We

25.

hold only that, on the facts of *this* case, the EIR did as much as it could to discuss the health effects of the project's significant air pollution impacts. It named the pollutants that would contribute to the significant cumulative impact and described ailments associated with those pollutants. Nothing of a more quantitative nature was called for under the circumstances.

Citizens' briefs could be understood to be making the additional argument that, although the air pollution impacts at the individual project level were found insignificant, they could have health effects if they involve any emissions, and therefore the EIR should have correlated those impacts with health effects as well. We conclude there is no authority for this notion. Guidelines section 15126.2, on which the *Bakersfield Citizens* holding is based, delineates the appropriate discussion in an EIR of *significant* environmental effects.

For these reasons, we hold the city did not fail to proceed in accordance with CEQA with respect to the EIR's discussion of the health effects of the project's air quality impacts.

## V.     *Statement of overriding considerations*

When an agency chooses to approve a project despite significant environmental impacts that cannot be avoided via mitigation measures, it must adopt a statement of overriding considerations explaining its reasons for this choice. (§ 21081, subd. (b); Guidelines, § 15093.) "Overriding considerations contrast with mitigation and feasibility findings. They are 'larger, more general reasons for approving the project, such as the need to create new jobs, provide housing, generate taxes, and the like.'" (*Woodward Park Homeowners, supra,* 150 Cal.App.4th at p. 717.) Nevertheless, it is not true "that an agency's unsupported claim that the project will confer benefits is sufficient." The considerations named in the statement must be supported by substantial evidence in the EIR or elsewhere in the record. (*Ibid.*) Further, the statement must represent a good-faith effort to inform the public of the agency's reasoning. (*Id.* at pp. 717-718.)

26.

In this case, a statement of overriding considerations was necessary because the EIR found three types of significant and unavoidable environmental impacts: cumulative impacts to air quality from operational emissions; individual and cumulative impacts arising from conversion of farmland to nonagricultural use; and individual and cumulative impacts to traffic. The city found there were 10 overriding considerations that justified these impacts. The project would:

- generate sales tax revenue for the city;
- increase the city's employment base and create diverse employment opportunities for city residents;
- provide buffers and transitions between commercial uses and adjacent residential uses;
- provide an attractive gateway development to the city;
- feature numerous energy conserving measures;
- provide attractive landscaping and amenities onsite and as viewed from adjacent streets;
- fulfill a general plan goal of creating a regional commercial center that provides quality goods and services;
- increase retail activity in the project area;
- be a good member of the community; and,
- contribute to the physical identity of the area and result in improvements to a major corridor.

The city found that "each of the overriding considerations … constitutes a separate and independent ground for" the finding that the project's benefits justified its approval despite the impacts.

Citizens argues that none of the 10 overriding considerations were supported by substantial evidence in the record. The city had discretion to base its decision on a single overriding consideration (*Flanders Foundation v. City of Carmel-by-the-Sea* (2012) 202

27.

Cal.App.4th 603, 624-625), and the statement included an express finding that each overriding consideration was sufficient by itself to justify the city's decision. Consequently, it is unnecessary for us to review all 10. We conclude that the first two overriding considerations—generation of tax revenue and jobs—were supported by substantial evidence.

Substantial evidence supported the city's finding that the project would generate increased sales tax revenue. The city relied on a sales tax analysis prepared by Bay Area Economics. This analysis predicted that the project, when complete, would cause a net increase in taxable sales in Ceres of about $34 million per year. The city calculated that these sales would generate new city sales tax revenue of about $327,000. The analysis is substantial evidence in support of the finding. The administrative record also contains a report commissioned by Wal-Mart analyzing the effect of new Wal-Mart Supercenters on taxable sales in California. The report found that in cities throughout California, including the Central Valley, taxable sales increased over multiple years after the opening of a Wal-Mart Supercenter.

Citizens argues that the project will not cause a net increase in taxable sales because the portion of the new Wal-Mart selling nongrocery items will be about the same size as the old Wal-Mart, and the grocery portion will sell mainly nontaxable merchandise. Further, the EIR states that the new Wal-Mart will probably generate lower sales per square foot than the old because its location means it is likely to lose some sales to Wal-Mart stores in Modesto. Citizens maintains that any increase in taxable sales would have to come from the project's non-Wal-Mart stores, and the time when these will be built and occupied, if ever, is unknown.

The Bay Area Economics report indicates, however, that despite the loss of some Modesto shoppers, the nongrocery part of the new Wal-Mart will still generate a margin of about $8 million in new taxable sales over and above the sales it will capture from other general merchandise stores in Ceres, including the old Wal-Mart. In addition, a

28.

portion of the sales from the grocery section of the new Wal-Mart will be taxable and will result in a net increase in taxable sales of about $3 million. The remainder of the $34 million net increase is indeed based on projected sales from stores and restaurants that will occupy the remainder of the shopping center. We do not believe the city was required to assume these would never really be built and never generate any sales. The city's approval of the project authorized their construction and, as the city and Wal-Mart point out, the EIR as a whole based its impact findings on the assumption that the entire project would be built. It was logical to use the same assumption when tallying the project's benefits.

Substantial evidence also supports the finding that the project will create job opportunities. It is undisputed that building the project will create construction jobs that would not exist if the project were not built. Further, the EIR states that the new Wal-Mart will employ 85 people in addition to the 375 employed at the old Wal-Mart (for a total of 460), and that the other stores in the shopping center, when built, will employ about 120 people. Thus the project will create 205 retail jobs.

Citizens does not dispute these figures, but argues instead that an increase in part-time positions at Wal-Mart is likely to cause a loss of full-time positions at other retailers. When asked by city staff how many of the new and old employees would be full time and how many part time, Wal-Mart declined to say. It answered only that "'[m]ore than 60 percent'" of its store workers in California are full-time employees. On this basis, Citizens argues that all of the 85 new Wal-Mart jobs could be part-time (since 85 is less than 40 percent of 460). Citizens then cites a report it presented to the city during the administrative proceedings. This report, commissioned in 2000 by the San Diego County Taxpayers Association (SDCTA), cited another study in which it was found that, for every part-time job created by a new large-scale discount store, 1.5 full-time jobs in small retail outlets were lost. Applying this, Citizens contends that 127 full-time jobs will be destroyed when the new Wal-Mart opens with 85 new part-time workers. Regarding the

other stores in the shopping center, Citizens again says there is only speculation that these will ever be built.

The city and Wal-Mart maintain that the 2000 SDCTA report should be disregarded because it is outdated. They cite a letter SDCTA sent to the mayor of San Diego in 2003 saying it no longer relied on the study because of the age of the data on which the study relied. On the issue of the other stores in the shopping center, the city and Wal-Mart say it would be unreasonable to exclude them from consideration, since the project presupposes their eventual construction and they will create jobs when built and occupied.

It is not our role to make a factual finding about whether the project will truly benefit or harm the job market. It is not enough for a challenger to present some evidence opposed to the agency's findings, for we do not resolve conflicts in the evidence under the substantial evidence standard. The only question is whether the record contains substantial evidence of a probable benefit. It does.

The two overriding consideration we have discussed—generation of tax revenue and creation of jobs—are the classic types of overriding considerations contemplated by CEQA. (See *Woodward Park Homeowners, supra,* 150 Cal.App.4th at p. 717.) These posit that tangible benefits of the project outweigh its negative effects. Most of the remaining overriding considerations are of a more nebulous nature. Because of our holding that two of the considerations are sufficiently supported, we need not consider the others.

## VI.   *Order taxing costs*

Wal-Mart argues that the trial court erred when it applied *Hayward Area Planning* to bar an award of costs to Wal-Mart for preparation of the administrative record. We agree.

Section 21167.6 includes the following provisions regarding preparation of the administrative record for purposes of CEQA actions:

"(a) At the time that the action or proceeding is filed, the plaintiff or petitioner shall file a request that the respondent public agency prepare the record of proceedings relating to the subject of the action or proceeding.… [¶] (b)(1) The public agency shall prepare and certify the record of proceedings .… The parties shall pay any reasonable costs or fees imposed for the preparation of the record of proceedings in conformance with any law or rule of court. [¶] (2) The plaintiff or petitioner may elect to prepare the record of proceedings or the parties may agree to an alternative method of preparation of the record of proceedings, subject to certification of its accuracy by the public agency .… [¶] … [¶] (f) In preparing the record of proceedings, the party preparing the record shall strive to do so at reasonable cost in light of the scope of the record."

In *Hayward Area Planning*, the plaintiffs sued the City of Hayward under CEQA, challenging the city's approval of a developer's project. The plaintiffs requested that the city prepare the administrative record. The city asked the law firm representing the developer to prepare the record. The city and developer prevailed in the trial court and the developer filed a cost bill seeking to recover against the plaintiffs the $50,193 it paid to its lawyers for preparation of the record, plus $228 in filing fees. (*Hayward Area Planning, supra*, 128 Cal.App.4th at pp. 179-180.) The plaintiffs filed a motion to tax costs, arguing among other things that the developer was not entitled to recover the cost of preparing the administrative record because that preparation was the responsibility of the public agency, not the project applicant, under section 21167.6. The trial court disagreed but found that the city should have notified the plaintiffs of its intention to delegate record preparation to the developer; also, the amount requested by the developer was unreasonable. The trial court directed the developer to file a revised cost bill. The plaintiffs appealed, contending the developer was not entitled to any recovery for preparing the administrative record. (*Hayward Area Planning, supra,* at pp. 180-181.)

The Court of Appeal agreed with the plaintiffs. It first stated that section 21167.6 provided only three alternatives for preparation of the administrative record: the agency can prepare it; the plaintiff can prepare it subject to the agency's certification; or the agency and plaintiff can agree on a different procedure. The court pointed out that

31.

preparation by a real party in interest (i.e., a project applicant like the developer) was not among the options. (*Hayward Area Planning, supra*, 128 Cal.App.4th at p. 183.)

Next, the Court of Appeal found that section 21167.6 was ambiguous on the question of whether a real party in interest could recover the cost of preparing the administrative record from a defeated plaintiff, if it should end up bearing that cost. On the one hand, the statute allowed recovery "in conformance with any law or rule of court" (§ 21167.6, subd. (b)(1)), a phrase that did not impose any limit on the parties who could recover. On the other hand, the provision allowing recovery of costs was part of the subdivision that said the public agency can prepare the record, which could be taken to imply that the public agency is also the party that can recover the cost of preparation. (*Hayward Area Planning, supra*, 128 Cal.App.4th at p. 183.)

The court resolved the ambiguity by finding that the policies of CEQA are best served by a rule that "the public agency must itself incur and seek recovery of the costs of record preparation when the record is prepared under subdivision (b)(1)." (*Hayward Area Planning, supra*, 128 Cal.App.4th at p. 185.) The court adduced several considerations in favor of this rule. First, the agency has incentives for minimizing costs that the applicant lacks. A public agency has a duty to act in the public interest and is accountable to its constituents if it fails to conserve public funds. (*Id.* at p. 184.) The applicant, by contrast, is free to act solely for its own private interest. (*Id.* at p. 185.) Further, when the agency prepares the record at its own expense, it knows it will have to justify any recovery in a public forum under the potential scrutiny of its constituents. This could be a motivation to avoid accumulating costs that are "exorbitant," like those claimed in the case. (*Ibid.*) Finally, allowing the applicant to prepare the record and recover the cost would undermine the statutory purpose of expediting CEQA litigation. (See § 21167.1, subd. (a) [CEQA actions to be given scheduling priority over other civil actions].) Because the applicant was preparing the record, "the mounting costs of record preparation did not come under scrutiny until the end of the trial court proceedings";

whereas the agency or plaintiffs, had they prepared it, "would have had reason to control those costs as the record was being prepared, promoting efficiency and limiting the need for time consuming litigation and judicial intervention." (*Hayward Area Planning, supra*, at p. 185.) The court also stated that delegation of the preparation of the record to the applicant undermined the statutory scheme because the plaintiffs were not informed of the delegation in advance and had no opportunity to choose to prepare the record themselves to avoid having the applicants do it. (*Id.* at p. 184.)

In its written order granting Citizens' motion to tax costs, the trial court quoted the *Hayward Area Planning* opinion's rule that "the public agency must itself incur and seek recovery of the costs of record preparation when the record is prepared under subdivision (b)(1)." (*Hayward Area Planning, supra*, 128 Cal.App.4th at p. 185.) The trial court observed that the city in this case did *incur* the cost of preparing the record when it gave the task to its outside counsel, but it did not *seek recovery* of the cost. Wal-Mart was doing that.

As we will explain, we disagree with the limitation in *Hayward Area Planning* on which prevailing parties are entitled to seek an award of the cost of preparing the administrative record. *Hayward Area Planning* got it right when limiting awardable administrative record costs to situations in which the record was prepared in a statutorily approved manner, but not when excluding real parties in interest from the set of prevailing parties to which an award can be made.

A central premise of *Hayward Area Planning* is that, under section 21167.6, a party can be awarded the cost of preparing the administrative record only if it was prepared in one of the ways described in that section: by the agency, by the plaintiff, or by another method agreed on by the agency and the plaintiff. This premise is not explicitly stated in the opinion, but it is a necessary support for the holding of the case. Here, the record was prepared by one of the statutorily approved methods: The agency

33.

prepared it. An award of costs to Wal-Mart thus would be consistent with this central premise.

In addition to stating the proper methods for preparing the administrative record (and thereby limiting the situations in which an award of costs for preparing it can be made), section 21167.6 provides that "[t]he parties shall pay any reasonable costs or fees imposed for the preparation of the record of proceedings in conformance with any law or rule of court." (§ 21167.6, subd. (b)(1).) Here, the law under which Wal-Mart applied for a costs award was Code of Civil Procedure sections 1032 and 1033.5. Citizens does not argue that a prevailing real party in interest that has reimbursed a coparty for otherwise allowable costs cannot recover those costs from an opposing party under those statutes. We see nothing in section 21167.6 from which we could infer a limitation on the identity of the prevailing parties that can recover administrative record costs under Code of Civil Procedure sections 1032 and 1033.5, so long as the record has been prepared in one of the three specified ways.

*Hayward Area Planning* holds that one reason a real party in interest should not be allowed, absent an agreement between the agency and plaintiff, to seek an award of administrative record costs paid to the agency is that the agency should be obliged to appear in a public forum to seek recovery in its own name. This, the court believed, would encourage public agencies to minimize the cost of preparing the record. (*Hayward Area Planning, supra*, 128 Cal.App.4th at p. 185.) This rule might or might not be good public policy, but we do not see how section 21167.6 implies it. Even if section 21167.6 reflects a cost-reducing motivation, it would be beyond the usual limits of judicial interpretation to discover in this motivation an unstated prohibition on real parties in interest submitting cost bills after reimbursing public agencies for preparing the administrative record.

Citizens argues that, just as the *Hayward Area Planning* court believed the real party there lacked a public agency's motivation to minimize costs in preparing the record,

34.

here the city's incentive to reduce costs was weakened because of the reimbursement agreement. The city knew it would be reimbursed in full, win or lose. Citizens says the cost-reducing spirit of section 21167.6 is against allowing recovery under those circumstances. In our view, the trial court's power under section 21167.6, subdivision (b)(1), and Code of Civil Procedure section 1033.5 to reduce unreasonable costs suffices to mitigate this concern.

Citizens says it did not have a chance to agree to the procedure by which the city would prepare the record and Wal-Mart would reimburse it. Citizens relies on the remarks in *Hayward Area Planning* about how the plaintiff in that case was not consulted before the agency entrusted the developer with the task of preparing the record. (*Hayward Area Planning, supra*, 128 Cal.App.4th at p. 184.) We do not think this was required in this case. We agree with the *Hayward Area Planning* court's view that section 21167.6 would require the plaintiff's agreement before an agency could delegate record preparation to a real party, but this does not imply anything about a real party covering an agency's costs after the record is prepared by the agency and then applying for a cost award as a prevailing party.

Code of Civil Procedure section 1032 states that a prevailing party is "entitled" to a cost award "as a matter of right" in "any action or proceeding," except "as otherwise expressly provided by statute." (Code Civ. Proc., § 1032, subd. (b).) The key premise of *Hayward Area Planning*—that administrative record costs can be recovered by a prevailing party only if the record was prepared in one of the approved ways—can rightly be seen as a specific limitation on cost awards imposed by section 21167.6; but we do not think a prevailing party's right to recover costs can be squared with an additional rule that a prevailing real party is barred from recovery by section 21167.6 even if the administrative record was prepared in one of the approved ways.

For these reasons, we will reverse the order granting Citizens' motion to tax costs. Because the trial court had no occasion previously to consider whether the claimed

administrative record costs were reasonable, we will remand to allow that determination to be made.

## ***DISPOSITION***

The judgment in case No. F070988 is affirmed.  The order to tax costs in case No. F071600 is reversed and the case is remanded for further proceedings consistent with this opinion.  Respondents are awarded costs on appeal in both cases.

_____

Smith, J.

I CONCUR:

_____

Poochigian, Acting P.J.

**FRANSON, J., Concurring.**

I concur in the decision to affirm, but write separately to state my views on the matters addressed in part IV of the majority opinion. These views address an environmental impact report's (EIR) discussion of the correlation between the project's air quality impacts and the indirect impacts to human health, a topic currently pending review by the California Supreme Court in *Sierra Club v. County of Fresno* (2014) 226 Cal.App.4th 704, review granted October 1, 2014, S219783.[1]

I.  CORRELATING A PROJECT'S AIR POLLUTANTS TO HEALTH IMPACTS

Drafters of an EIR have several ways to categorize environmental impacts. For instance, environmental impacts can be classified as (1) on-site or off-site, (2) indirect or direct, (3) construction or operational,[2] or (4) project-level or cumulative. (See Guidelines,[3] Appen. G., instruction 2.)

In this case, the EIR separately addressed project-level impacts and cumulative impacts.[4] It also subdivided the discussion of project-level impacts into a construction

---

[1]  If Citizens seeks review of the air quality issues in the present case, our Supreme Court might grant review and defer briefing pending a decision in *Sierra Club* due to the possibility that the issues presented for review in this case will be affected by the conclusions and analysis adopted in deciding *Sierra Club*.

[2]  These first three binary classifications are based on (1) the relative location of the project and the impact, (2) the number of links in the causal chain connecting the impact to the project, and (3) the chronology of the impact as the project must be built before it can operate.

[3]  The term "Guidelines" refers to the regulations that implement the California Environmental Quality Act (CEQA) and are codified in California Code of Regulations, title 14, section 15000 et seq.

[4]  Project-level impacts are the direct (primary) and indirect (secondary) "effects which are caused by the project." (Guidelines, § 15358, subd. (a).) Cumulative impacts are two or more individual impacts which, when taken together, are considerable, or which increase other environmental impacts. (Guidelines, § 15355.) A cumulative impact addressed in an EIR is the incremental impact of the project (i.e., the project-level impact) added to the collective impact of closely related past, present and reasonably

1

phase and operational phase. Consequently, the following description of the contents of the EIR and the findings in the city's resolution is organized by addressing project-level construction and operational impacts and then cumulative impacts. The distinction between direct and indirect impacts is relevant to the discussion in part I.B.2, *post*, about human health problems.

        A.      <u>Contents of the EIR and City's Findings</u>

The EIR addressed the air quality impacts of the project's construction and its operation separately. The city council resolution certifying the final EIR tracked the EIR's format by separately addressing construction and operational impacts to air quality. Accordingly, the facts material to the project's emission of air pollutants, and the thresholds of significance applied to those emissions, are described for both the construction and operational phases of the project. The facts about the project's individual impacts are followed by a description of the project's contribution to cumulative air quality impacts.

        *1.      Project-Level (i.e., Individual) Construction Impacts*

The city council resolution stated that the construction of the project would result in emissions of criteria air pollutants potentially violating or contributing to an existing violation of one or more air quality standards. The resolution addressed this potential impact by describing mitigation measures and then found that the mitigation, "which has been required in or incorporated into the Project, will reduce the significant environmental impact to a *less-than-significant* level." This finding of an insignificant air quality impact was supported by reference to a table in the EIR showing "emissions resulting from Project construction would not exceed criteria pollutant thresholds

---

foreseeable future projects. (*Id*., subd. (b).) A cumulative impact can become "significant" for purposes of CEQA when individually minor impacts accumulate over time. (*Ibid*.)

2

established by SJVAPCD."[5]  Therefore, the city's ultimate finding of a less-than-significant impact was based on the thresholds of significance established by SJVAPCD for criteria air pollutants.[6]

The SJVAPCD's thresholds of significance for reactive organic gases (ROG), oxides of nitrogen ($NO_x$), and particulate matter with a diameter of 10 microns or smaller ($PM_{10}$) are 10, 10, and 15 tons per year, respectively.  In the final EIR, these thresholds were compared to the estimated emissions from the construction of the project for both 2008 and 2009 and the estimated yearly emissions were well below the thresholds.  For instance, the 2008 construction emissions for ROG, $NO_x$ and $PM_{10}$ were estimated at 1.56, 4.43 and 1.76 tons, respectively.

### 2.    Project-Level (i.e., Individual) Operational Impacts

As to operational emissions, the city council resolution stated the project would result in long-term emissions of criteria air pollutants that could violate or substantially contribute to an existing violation of one or more air quality standards.  The resolution stated that vehicle emissions would account for a majority of the project's operational emissions, which also would include emissions from the fuel used in landscaping equipment and the evaporation of solvents in paint and other surface coatings used to maintain the buildings.  As to the magnitude of the operational emissions, the resolution stated:  "The total emissions from the Project exceed the SJVAPCD's thresholds for reactive organic gases (ROG) and oxides of nitrogen ($NO_x$).  In addition, the Project would emit a significant amount of particulate matter $(PM)_{10}$ and $PM_{2.5}$ that would

---

**5**    SJVAPCD is the acronym for the San Joaquin Valley Air Pollution Control District.

**6**    Public agencies are "encouraged to develop and publish thresholds of significance that the agency uses in the determination of the significance of environmental effects." (Guidelines, § 15064.7, subd. (a).)  The city's adoption in the EIR of the SJVAPCD's thresholds of significance is consistent with subdivision (c) of Guideline section 15064.7.

contribute to the SJVAPCD's existing air quality violations for particulate matter." The resolution then discussed various mitigation measures and Wal-Mart's ISR (indirect source review) application showing compliance with SJVAPCD Rule 9510. The resolution found that the ISR application "demonstrates that the Project's operational emissions will be *less-than-significant*."

The foregoing determinations relating to the significance of operational emissions of ROG, $NO_x$ and $PM_{10}$ were based on (1) estimates of those emissions derived from models and (2) a comparison of those estimates to the thresholds of significance adopted by the SJVAPCD. For example, the final EIR stated that "the refined URBEMIS model run shows that the operational impacts associated with the project are less than significant."

The estimates of the project's annual operational emissions of ROG, $NO_x$ and $PM_{10}$, after mitigation, were 9.97, 9.67 and 5.16 tons, respectively. (Table 4.2-8 of the final EIR.) The predicted emissions did not exceed the SJVAPCD's thresholds of significance, but the amounts of ROG and $NO_x$ barely fell below the 10-ton-per-year thresholds.[7] The mitigation measures were important to the significance determination as Table 4.2-7 shows that the predicted levels of ROG and $NO_x$ prior to mitigation exceeded the SJVAPCD's thresholds.

### 3. *Cumulative Impacts*

Section 4.2.4 of the EIR addressed cumulative air quality impacts and recited the CEQA definition of cumulative impacts as "two or more individual effects which, when

---

[7] The important of choosing a model is illustrated by comparing the final EIR's reliance on the refined URBEMIS model with the draft EIR's use of the URBEMIS 2007 model. The 2007 model estimated peak operational emissions (without mitigation) of ROG, $NO_x$ and $PM_{10}$ at 31.99, 54.69 and 23.68 tons per year, respectively. Table 4.2-7 of the final EIR provided revised estimates of the peak operational emissions (without mitigation), which were 11.63, 15.15 and 6.31 tons of ROG, $NO_x$ and $PM_{10}$, respectively.

considered together, are considerable or which compound or increase other environmental impacts." (Guidelines, § 15355.) The EIR explained that a significant cumulative impact, as defined in CEQA, can result from an aggregation of impacts not individually significant. It also noted that the SJVAPCD considered certain individually insignificant air quality impacts to also have a significant cumulative air quality impact. As a standard of significance, the EIR stated that a significant cumulative impact to air quality would result if the proposed project would cause a cumulatively considerable net increase in any criteria pollutant for which the San Joaquin Valley air basin is in nonattainment under applicable federal or state air quality standards.

Section 4.2.4 of the EIR stated the assumptions "that numerous projects will be under construction simultaneously with the proposed project throughout the air basin" and these projects would result in significant and unavoidable impacts despite being subject to the same SJVAPCD rules and regulations that apply to the present project. As to the project's emissions of $NO_x$ and $PM_{10}$, which are nonattainment pollutants, the EIR stated that compliance with SJVAPCD's rules and regulations would reduce but not eliminate the emissions, and additional mitigation would not be feasible. Ultimately, the EIR concluded that "the proposed project's cumulative impact to air quality from operational emissions is considered cumulatively considerable and significant and unavoidable."

The foregoing approach to cumulative air quality impacts is not consistent with the EIR's general statement that "[p]ast, present and probable future projects will be considered when determining the cumulative setting and the proposed project's contribution to identified cumulative impacts. The context of particular impact analysis will determine which of [the 17] projects [listed in Table 4.0-1] are relevant to that analysis." (See Guidelines, § 15130, subd. (b)(1)(A) [discussion of cumulative impacts based on a list of past, present and probable future projects producing related or

5

cumulative impacts].) The EIR used assumptions to avoid identifying the emission levels of the other projects and comparing those levels to the SJVAPCD's thresholds of significance. Whether this approach to cumulative air quality impacts complies with Guidelines section 15130's requirements for discussing cumulative impacts is not an issue raised by Citizens in this appeal. The omission of this information is noted here because it deprives the reader of the EIR of a sense of proportion about this project's contribution to a significant cumulative impact of unstated volume.

B.    Big Picture Points

1.    *Units of Measurement*

Generally, an EIR's discussion of a particular impact and the related threshold of significance, is put in its environmental context by the EIR's description of the environmental setting and the baseline used for the impact. The units of measurement chosen to describe (1) the impact—that is, the physical change to the environment, (2) the threshold of significance, and (3) the baseline, affect how rapidly decisionmakers and the public can understand the change and put in it perspective. (See Guidelines, § 15140 [EIR's shall be written so that they can be rapidly understood].) Typically, an EIR discusses an environmental impact by using the same units of measurement to describe (1) the physical change resulting from the project, (2) the thresholds of significance, and (3) the baseline conditions. (E.g., *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1123 [existing noise levels and predicted increase stated in decibels].) When information is presented using the same units, readers immediately have an idea of how large the physical change is compared to existing conditions and, as a result, have a sense of proportion as to the scope of the physical change caused by the project.

Air quality impacts in the San Joaquin Valley air basin are not discussed in the EIR using this basic approach. Here, the EIR presented baseline data about air pollutants in parts per million or microgram per cubic meter. In contrast, tons per year are used to

6

state (1) the thresholds of significance and (2) the physical changes resulting from the project (i.e., the amount of pollution emitted). As a result, a decisionmaker or member of the public reading the EIR's description of emissions data in tons per year will not be informed of how those emissions will change the baseline air quality figures. Thus, the way information is presented about the impact, the threshold of significance and the baseline does not create a sense of proportion as to the physical changes caused by the project's air pollutant emissions.[8]

I make this general point about air quality discussions because it has consequences that affect the disclosures necessary to adequately inform the reader of an EIR about the health problems caused by the project's impact on air quality.

### 2. How to Conceptualize Health Problems for Purposes of CEQA

Another aspect of the larger picture relates to how CEQA conceptualizes health problems caused by air pollution. Identifying that concept is a first step towards understanding how those health problems fit into CEQA's regulatory context and is a useful foundation for the questions of regulatory interpretation presented in this case.

Health problems are a type of environmental effect—specifically, an indirect (i.e., secondary) effect. (Guidelines, § 15358, subd. (b)(2) [definition of indirect effect].) First, a project causes a *direct* physical change in the environment by emitting pollutants into the air. Air is a part of the "environment" protected by CEQA. (Guidelines, § 15360 [definition of environment].) Second, the physical change to the air's composition

---

[8] An EIR, of course, can provide additional information that provides a sense of proportion. For example, an EIR certified in 1988 for a coal-fired powerplant compared the project's emissions for certain criteria pollutants to the total regional emissions of the pollutants. (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 714 (*Farm Bureau*)).) It also provided figures about ambient $PM_{10}$ that "indicate[d] the project would cause a 1 to 2 percent increase." (*Ibid*.) This information provided some sense of proportion between the physical changes caused by the project to the baseline air quality conditions.

7

induces changes in human health. The changes in human health are regarded as an indirect effect resulting from the project.

Therefore, a discussion of human health problems caused by the physical changes in air quality that result from a project's emissions is simply a discussion of an indirect environmental impact. The importance of impacts on human health is incontrovertibly established by CEQA's policy statement about the necessity of providing "a high-quality environment that at all times is healthful …." (Pub. Resources Code, § 21000, subd. (b).)[9] In short, human health is one of the basic reasons why California has an environmental protection statute and, therefore, it should not be given short shrift.

C.      Issues Presented

The facts of this case and the arguments about correlating air quality impacts to resultant health problems raise two issues of interpretation involving the scope of the disclosure provisions in subdivision (a) of Guidelines section 15126.2 (Guideline 15126.2(a)). First, do the disclosure provisions of Guideline 15126.2(a) apply when a significant air quality impact is found to have been rendered less than significant by mitigation measures. Second, do the disclosure provisions apply when an air quality impact is not individually significant, but is a cumulatively considerable part of a significant cumulative impact? In the factual context of this case, I answer both questions "no." As a result, Citizens' challenge to the EIR's discussion of air quality impacts fails.

D.      Overview of Relevant Sources of Law

1.      Case Law

In *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184 (*Bakersfield Citizens*) this court concluded that the EIR's for two

---

[9]      All further statutory references are to the Public Resources Code unless noted otherwise.

8

proposed shopping centers containing Wal-Mart Supercenters "omitted relevant information when they failed to correlate the identified adverse air quality impacts to resultant adverse health impacts" and the omission could not be dismissed as a harmless or insignificant defect. (*Id.* at pp. 1219, 1220.) We explicitly identified Guideline 15126.2(a) as the legal basis for the conclusion. (*Bakersfield Citizens*, *supra*, at p. 1219.)

Therefore, the dispute in the instant case about the need for a discussion that correlates the adverse air quality impacts to resultant adverse health impacts is, at bottom, a dispute about the meaning and the application of the disclosure provisions in Guideline 15126.2(a). The words of a regulation or statute are the starting point for determining the meaning. (*Leavitt v. County of Madera* (2004) 123 Cal.App.4th 1502, 1513.) Also, particular provisions of a regulation must be construed within the context of the broader regulatory and statutory scheme. (See *El Morro Community Assn. v. California Dept. of Parks & Recreation* (2004) 122 Cal.App.4th 1341, 1354 [courts must be mindful of the purposes of the statute when interpreting Guidelines].) Based on these principles, the relevant text from the Guidelines and CEQA is set forth below. Determining the meaning of the text in Guideline 15126.2(a) presents a question of law subject to independent review on appeal. (*San Francisco Beautiful v. City and County of San Francisco* (2014) 226 Cal.App.4th 1012, 1021 [interpretation of language in the Guidelines presents a question of law subject to de novo review].)

2.      *Regulatory Text of Guideline 15126.2(a)*

Guideline 15126.2(a) addresses the contents of an EIR. Its heading, along with its first and third sentence, provide:

> "(a) The Significant Environmental Effects of the Proposed Project. An EIR shall identify and focus on the *significant* environmental effects of the proposed project.… Direct and indirect *significant* effects of the project on the environment shall be clearly *identified* and *described*, giving due consideration to both the short-term and long-term effects." (Italics added.)

9

The use of "shall" in these sentences demonstrates that the prescribed EIR contents are mandatory—that is, "all public agencies are required to follow" them. (Guidelines, § 15005, subd. (a) [definition of "shall"].) The directive that significant environmental effects "be clearly identified and described" is elaborated by the fourth sentence Guideline 15126.2(a), which states:

> "The discussion *should* include *relevant specifics* of [1] the area, [2] the resources involved, [3] physical changes, [4] alterations to ecological systems, and [5] *changes induced in* [a] population distribution, [b] population concentration, [c] the human use of the land (including commercial and residential development), [d] *health* and safety *problems caused by the physical changes*, and [e] other aspects of the resource base such as water, historical resources, scenic quality, and public services."[10] (Italics added.)

Distilling this language down to the phrases essential to the present appeal, an EIR's "discussion should include relevant specifics of … changes induced in … health … problems caused by the physical changes." (Guideline 15126.2(a).) The use of the word "should," rather than "shall," does not mean public agencies have the discretion to ignore the sentence. (Cf. Guidelines, § 15005, subd. (c) [definition of "[m]ay"].) The word "[s]hould" is used to identify guidance "based on policy considerations contained in CEQA" and "agencies are advised to follow this guidance in the absence of compelling, countervailing considerations."[11] (Guidelines, § 15005, subd. (b) [definition of

---

**10**     The structure of the list contained in the fourth sentence of Guideline 15126.2(a) might appear cumbersome at first reading. It is a list of five topics, with the fifth being a sublist of *indirect* effects. (See Guidelines, § 15358, subd. (a)(2) [definition of indirect effect].) The third sentence refers to "[d]irect and indirect significant effects of the project" and, thus, foreshadows the fourth's sentence inclusion of a sublist of specific types of indirect effects.

**11**     In this case, I have located no statement in the EIR or finding in the city council's resolutions that the recommended discussion could not be provided because of compelling, countervailing considerations. Thus, a failure to include the discussion described in the fourth sentence cannot be justified by relying on the exception created by Guideline 15126.2(a)'s use of the word "should."

"[s]hould"].)  This definition's reference to "policy considerations contained in [CEQA]" leads directly to the policy statements included in CEQA by the Legislature.

### 3.    *CEQA's Policy Statements*

The legislative policy statements that are relevant to the interpretation and application of Guideline 15126.2(a) include CEQA's first two subdivisions, which provide:  "(a)  The maintenance of a quality environment *for the people of this state* now and in the future is a matter of statewide concern.  [¶]  (b) It is necessary to provide a high-quality environment that at all times is *healthful* and pleasing to the senses and intellect of man."  (§ 21000, italics added.)  These provisions establish the basic ideas that (1) people are the most important life form for purposes of CEQA and (2) human health is a primary reason for protecting the environment.

Next, section 21000, subdivision (c) provides:  "There is a need to understand the *relationship between* the maintenance of high-quality ecological systems and the general welfare of the people of the state, including their enjoyment of the natural resources of the state."  In my view, air is part of an "ecological system" for purposes of this subdivision and the term "general welfare of the people" encompasses human health. Thus, this general policy statement about understanding relationships supports an interpretation of the Guidelines to mean that an EIR should help the reader (whether a decisionmaker or a member of the public) understand the relationship (i.e., the correlation) between air quality impacts and human health.

The policy statements in section 21002.1 address the purpose of an EIR and, therefore, are relevant to interpreting and applying Guideline 15126.2(a), which addresses the contents of an EIR.  Section 21002.1, subdivision (e) states:

> "To provide more meaningful public disclosure, reduce the time and cost required to prepare an environmental impact report, and focus on potentially *significant* effects on the environment of a proposed project, lead agencies shall, in accordance with Section 21100, focus the discussion

11

in the environmental impact report on those potential effects on the environment of a proposed project which the lead agency has determined are or may be *significant*. Lead agencies may limit discussion on other effects to a brief explanation as to why those effects are not potentially *significant*." (Italics added.)

The repeated references to *significant* environmental effects correspond to the use of the word "significant" in the first and third sentences of Guideline 15126.2(a). The reference to "meaningful public disclosure" also is addressed in section 21003, subdivision (b), which states it is the policy of California that EIR's and other CEQA documents "be organized and written in a manner that will be meaningful and useful to decisionmakers and to the public."

In summary, the foregoing statements of policy in CEQA help interpreting and applying Guideline 15126.2(a) because of (1) the use of the word "should" in its fourth sentence is a reference to those policy statements, (2) there are parallels in the language used in CEQA and Guideline 15126.2(a), and (3) the general principle that the Guidelines must be interpreted to implement the purposes of CEQA.

### 4. Invention Versus Interpretation

Having laid the textual foundation, both regulatory and statutory, for an analysis of the air quality issues presented in this appeal, this concurrence circles back to *Bakersfield Citizens* and addresses the controversy about what that decision did when it concluded the EIR's failed "to correlate the [significant] adverse air quality impacts to resulting adverse health consequences" and such an omission could not "be dismissed as harmless." (*Bakersfield Citizens*, *supra*, 124 Cal.App.4th at p. 1220.) Specifically, did this court violate CEQA by inventing "procedural or substantive requirements beyond those explicitly stated in [CEQA] or in the state guidelines"? (§ 21083.1, added by Stats. 1993, ch. 1070, § 2, p. 5917.) Alternatively, did this court interpret general language in Guideline 15126.2(a) and state how that interpretation applied to a specific type of environmental impact (i.e., air pollution) and its consequences (i.e., health problems)?

12

In my view, *Bakersfield Citizens* did not violate section 21083.1 by inventing a new disclosure requirement for EIR's. Instead, it (1) interpreted the mandatory language about clearly identifying and describing significant environmental effects and (2) because compelling, countervailing considerations were not presented, referred to the guidance in the fourth sentence of Guideline 15126.2(a) to determine the meaning of the phrase "clearly identified and described." Then, the court applied its interpretation of Guideline 15126.2(a) to the facts presented. That application led the court to conclude the EIR's "omitted relevant information when they failed to correlate the identified adverse air quality impacts to resultant adverse health effects." (*Bakersfield Citizens*, *supra*, 124 Cal.App.4th at p. 1219.)

My view of the analytical steps inherent in *Bakersfield Citizens* comports with the wording of that opinion and Guideline 15126.2(a). First, the court's phrase "relevant information" is the equivalent of regulatory phrase "relevant specifics." (*Bakersfield Citizens*, *supra*, 124 Cal.App.4th at p. 1219.) Second, Guideline 15126.2(a) uses the word "identified" in connection with significant environmental effects, while the court's conclusion used "identified" in connection with a specific environmental effect—namely, "identified adverse air quality impacts." (*Bakersfield Citizens*, *supra*, at p. 1219.) Third, the court twice used of the word "correlate" in reference to "adverse air quality impacts" and then used the words "resultant" and "resulting" immediately before "adverse health effects" and "adverse health consequences," respectively. (*Id*. at pp. 1219, 1220.) The court's choice of words rephrased the regulation's use of "induced in" after "changes" and its use of "caused by the physical changes" after health problems. (Guideline 15126.2(a).) The words "correlate," "resultant" and "resulting"—like the phrases "induced in"[12] and "caused by"—were chosen to indicate a connection between two or

---

[12] Guideline 15126.2(a) uses of the phrase "changes induced in" demonstrates that "health problems" are regarded as an indirect effect. The definition of indirect effect in

13

more things.  In the factual setting of *Bakersfield Citizens*, the two things were air quality impacts and adverse health consequences.  Therefore, I do not read *Bakerfield Citizens* as inventing a new disclosure requirement—the disclosure described in *Bakerfield Citizens* and its progeny is required by Guideline 15126.2(a).

                5.        *Summary*

The foregoing recitation of text in Guideline 15126.2(a) and CEQA and the discussion of *Bakersfield Citizens* lays the foundation for the following questions of regulatory interpretation.  First, do the disclosure provisions of Guideline 15126.2(a) apply when a significant air quality impact is found to have been rendered less than significant by mitigation measures.  Second, do the disclosure provisions apply when an air quality impact is not individually significant, but is a cumulatively considerable part of a significant cumulative impact?

          E.        <u>Interpretation of Guideline 15126.2(a)</u>

                1.        *Project-Level Impacts That Are Less Than Significant*

The first sentence in Guideline 15126.2(a) states that "[a]n EIR shall identify and focus on the *significant* environmental effects of the proposed project."  (Italics added; cf. Guidelines, § 15128 [EIR's treatment of effects determined not to be significant].)  Similarly, its second sentence refers to "*significant* effects of the project on the environment."  (Guideline 15126.2(a), italics added.)  These references to significant effects echo the CEQA policy that a lead agency shall focus the discussion in the EIR on potentially significant effects on the environment.  (§ 21002.1, subd. (e); see § 21100, subd. (b)(1) [EIR is required to set forth all significant effects on the environment].)

---

Guidelines section 15358, subdivision (a)(2) uses the phrase "induced changes."  Aside from an appendix, these are the only two places in the Guidelines where the word "induced" appears.

14

The use of "significant" in these sentences is ambiguous as to whether "significant" includes effects that are predicted to be *significant before mitigation* or is limited to effects that still are *significant after mitigation*. Neither CEQA nor the Guidelines explicitly resolve this ambiguity. (See Guidelines, § 15382 [definition of "significant effect on the environment"].) Subdivision (b) of Guidelines section 15126.2 states: "Describe any significant impacts, including those which can be mitigated but not reduced to a level of insignificance." This language also is susceptible to conflicting interpretations, but the stronger inference is that impacts that are reduced to a level of insignificance need not be described to the same extent at those that remain significant after mitigation.

The rationale for interpreting Guideline 15126.2(a) as applying to environmental effects that remain significant after mitigation (not the situation in this case) is that EIR's should discuss the *actual* impacts a proposed project will cause, rather than hypothetical situations that will not occur.

First, discussing a scenario that is not predicted to occur would clutter the EIR with material that is distracting, rather than "meaningful and useful to decisionmakers and to the public." (§ 21003, subd. (b).) In contrast, a discussion of environmental effects that are predicted to be significant after the actual project is built is useful to decisionmakers who must (1) balance those significant effects against the benefits of the project and (2) decide whether those benefits constitute overriding considerations for purposes of CEQA. (See Guidelines, § 15093 [balancing required before adopting statement of overriding considerations].)

Second, a discussion of a hypothetical project that does not include the mitigation measures, here a different street design, different sidewalks, different bike lanes and storage, and Wal-Mart buildings without the energy saving measures, would expand the time and cost spent preparing the EIR by including a scenario that has no potential for

15

being implemented.  Such a result is contrary to the policies stated in subdivision (e) of section 21002.1 to "reduce the time and cost required to prepare an [EIR]" and to "focus on potentially significant effects on the environment of a proposed project."

In summary, the disclosure provisions in Guideline 15126.2(a) do not apply to the proposed project's air quality impacts because its individual air pollutant emissions do not remain significant after the consideration of the air quality measures listed in the final EIR.

### 2. *Cumulative Impacts*

The final EIR states that "the proposed project's cumulative impact to air quality from operational emissions is considered cumulatively considerable and significant and unavoidable."  This finding is based on the assumptions "that numerous projects will be under construction simultaneously with the proposed project throughout the air basin" and these projects would result in significant and unavoidable impacts despite being subject to the same SJVAPCD rules and regulations that apply to the present project. This finding presents the question of whether the disclosure provisions in Guideline 15126.2(a) apply to a significant *cumulative* impact when the project-level impact was cumulatively considerable but less than significant.

Therefore, this case presents a situation where (1) the project-level air quality impact was less than significant but cumulatively considerable and (2) the cumulative impact was significant.  This situation presents the question of whether the disclosures required by Guideline 15126.2(a) for "significant environmental effects" applies when it is the cumulative impact that is significant, not the cumulatively considerable project-level impact.

I conclude that Guideline 15126.2(a) does not apply when the project-level impact is less than significant and the cumulative impact is significant.  This question of

16

interpretation was not decided, explicitly or implicitly, in *Bakersfield Citizens* because the project-level impacts in that case were significant.

First, an EIR's discussion of cumulative impacts is addressed by Guidelines section 15130. Consequently, there is no need to read Guideline 15126.2(a) to overlap with the provision expressly designed to address cumulative impacts. Furthermore, Guidelines section 15130 does not contain a disclosure requirement that parallels or is similar to the "discussion [of] relevant specifics" described in the fourth sentence of Guideline 15126.2(a). Indeed, it provides that "[t]he discussion of cumulative impacts … need not provide as great detail as is provided for the effects attributable to the project alone." (Guidelines, § 15130, subd. (b).)[13]

Second, Guideline 15126.2(a) does not use the terms "cumulative" or "cumulatively." Instead, it refers to "the significant environmental effects *of the proposed project*" and "significant effects *of the project* on the environment." (Guideline 15126.2(a), italics added.) The italicized prepositional phrases in the quoted text qualify or limit the type of significant effects covered to those caused by the project.

Third, the drafters of Guidelines section 15126.2 were capable of mentioning cumulative impacts when that was their intent. Guidelines section 15126.2, subdivision (d) addresses the growth-inducing impact of a proposed project and provides in part: "Also discuss the characteristic of some projects which may encourage and facilitate other activities that could significantly affect the environment, either individually *or cumulatively*." (Guidelines, § 15126.2, subd. (d), italics added.) This explicit reference to a cumulative effect renders the omission of such a reference in Guideline 15126.2(a) all the more telling. (See *In re Jennings* (2004) 34 Cal.4th 254, 273 [rule of statutory

---

**13**    In this case, Citizens has not argued that Guidelines section 15130 requires the EIR to correlate significant cumulative air quality impacts to the health problems caused by those cumulative impacts

17

construction that reference to a subject in one provision and its omission from another provision is significant to show a different legislative intent].)

Therefore, I interpret Guideline 15126.2(a) to mean that its disclosure provisions do not apply when the project's air quality impacts are less than significant, even though the cumulative air quality impacts are significant and the project's contribution is cumulatively considerable. Applying my interpretations to the facts of this case, I conclude the EIR was not required by law to set forth a discussion of the correlation between the project's emission of air pollutants and the health problems caused by those pollutants.[14]

II.     ADDITIONAL ISSUES ABOUT THE DISCLOSURE

In the event that a discussion of the correlation between the project's air quality impacts and resulting adverse health impacts is required in this case, the following questions are arise: (1) What must be contained in an EIR's discussion to satisfy the correlation requirement? (2) Is specific information that would satisfy the correlation requirement available?

---

[14]     Therefore, Citizens' argument that the indirect health impacts of the project could be significant, even if the air quality emissions do not exceed the thresholds of significance established by the SJVAPCD, and merit discussion in the EIR is contrary to the present wording of Guideline 15126.2(a). In other words, the regulation implies that there will be no significant indirect health impact caused by the project's emissions so long as those emissions are not significant. However, I think the factual accuracy of such an implication is weak. Concluding that there are no health impacts of air pollution so long as the state and federal standards are not exceeded, is contrary to the day-to-day experience of many who live in the San Joaquin Valley air basin. Also, such an implication that replaces actual analysis of the potential indirect impacts on human health appears contrary to the policy considerations underlying CEQA. Nevertheless, the wisdom of this implication is beyond the challenges raised in this appeal, which involves the interpretation and application of Guideline 15126.2(a) as written, and not whether the regulation is "consistent and not in conflict with [CEQA] and reasonably necessary to effectuate the purpose of the statute." (Gov. Code, § 11342.2 [validity of regulations].)

18

A.    Contents of the Correlation Discussion

Based on my conclusion that *Bakersfield Citizens* did not invent a new disclosure requirement, the question about the details that must be set forth in an EIR to satisfy the correlation requirement described in *Bakersfield Citizens* can be reframed as a question of what Guideline 15126.2(a) requires to be described and discussed.

1.    *Absence of Specifics in the Guidelines and CEQA*

Initially, CEQA and the Guidelines do not specify a list of the details that must be contained in an EIR's discussion of the correlation between the significant air quality impacts and resulting health problems. CEQA and the Guidelines are designed to cover a myriad of environmental impacts and their consequences, including changes in health problems. Accordingly, CEQA and the Guidelines provide general rules and do not attempt to create exhaustive lists of details necessary for a discussion to be deemed meaningful and useful to the decisionmakers and the public.

In my view, the absence of a greater specificity in the statute and regulation does not mean the drafters intended an EIR's disclosure of the adverse health impacts caused by the project's significant air quality impacts to be limited to a general acknowledgment that air pollution harms human respiratory health. That information "is well known." (*Bakersfield Citizens*, *supra*, 124 Cal.App.4th at p. 1219.) The reference to "*relevant specifics* of [1] the area, [2] the resources involved, [3] physical changes, [4] alterations to ecological systems, and [5] *changes induced in* … [d] *health* and safety *problems caused by the physical changes*" demonstrate an intention to have information *specific* to the project and its direct and indirect impacts presented in the EIR. (Guideline 15126.2(a), italics added.) The reference to "relevant specifics" and the two phrases of causal connection—that is, changes "induced in" and problems "caused by"—show that the specifics that are relevant pertain to the actual change in human health that will result

19

from the project. As a result, a general statement that an air pollutant is associated with chronic bronchitis and lung irritation falls short of satisfying this regulatory language.

I recognize that it is frustrating for those drafting EIR's and defending them in court not to be told in specific terms what is necessary to satisfy the mandatory "clearly identif[y] and describ[e]" requirement in the third sentence of Guideline 15126.2(a) and the guidance contained in its fourth sentence. However, it is not the role of the courts to identify those specifics because that would infringe upon the discretionary choices committed to lead agencies. It is well established that a lead agency's choice of methodology for studying an impact (which will affect the information generated and then disclosed in the EIR) will be upheld if that choice is supported by substantial evidence. (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 898.) In addition, CEQA explicitly states that courts are not authorized "to direct any public agency to exercise its discretion in any particular way." (§ 21168.9, subd. (c).) Thus, when there are many acceptable ways to present information, a writ of mandate cannot direct the agency to present information in a particular way and forego using other acceptable options.

Therefore, I do not believe Citizens' failure to provide a precise description of the additional information required by Guideline 15126.2(a) is a ground for concluding Citizens failed to demonstrate the EIR's disclosures were inadequate.[15]

---

**15** A court's inquiry into the adequacy of the discussion of health problems is aided by provisions in the Guidelines that address, among other things, forecasting, the degree of specificity required in an EIR, and standards for adequacy of an EIR. (See Guidelines, §§ 15144 [forecasting], 15146 [degree of specificity], 15151 [standards of adequacy of an EIR].) "An EIR on a construction project will necessarily be more detailed in the specific effects of the project than will be an EIR on the adoption of" planning documents or zoning ordinances. (Guidelines, § 15146, subd. (a).) The reference to "the specific effects of the project" includes both direct and indirect effects. Therefore, when cases, the like present one, involve a construction project, more details about specific effects are required and indirect impacts on health problems qualify as a "specific effect."

20

## 2.     *Do the Details Provided Serve the Disclosure's Purpose?*

Despite the inability of a court to identify a single set of specifics that must be disclosed to satisfy Guideline 15126.2(a), courts are capable of determining whether the disclosure provided is adequate—that is, whether the EIR is sufficient as an informational document. (Guidelines, § 15003, subd. (i).) That determination is made by applying the regulatory text and analyzing whether the disclosures provided fulfill the underlying purpose of the regulation.

To illustrate this approach, assume that the disclosure requirements in Guideline 15126.2(a) applied to the project's air pollutant emissions, and I will address whether the EIR's details relating to the health problems associated with ROG, $NO_x$ and $PM_{10}$ adequately disclose the "relevant specifics" about "changes induced in … health … problems caused by the physical changes" resulting from the operation of the project. (Guideline 15126.2(a).) This illustration is limited to the EIR's discussion of the health problems associated with $NO_x$ because the disclosures relating to ROG, $PM_{10}$ and ozone are similar in terms of the level of detail provided.

The EIR stated: "Health effects associated with $NO_x$ are an increase in the incidence of chronic bronchitis and lung irritation. Chronic exposure to $NO_2$ may lead to eye and mucous membrane aggravation, along with pulmonary dysfunction."     This general acknowledgement that $NO_x$ emissions are associated with respiratory, pulmonary and membrane problems does not contain the relevant specifics about the health problems caused by the increase in $NO_x$ (i.e., the physical change) resulting from this project. A conclusion that this general acknowledgement was adequate would be the equivalent of interpreting Guideline 15126.2(a) to mean an EIR need only describe the health problems "generally caused by an air pollutant." Instead, it refers to "changes induced in … health … problems caused by the physical changes." (Guideline 15126.2(a).) In my view, "the physical changes" referred to are those mentioned earlier in the sentence and, thus, are

21

the physical changes caused by the proposed project. (Cf. Guidelines, § 15378, subd. (a) [definition of "project" as action resulting in physical change to the environment].) Similarly, "relevant specifics" and "changes induced in" demonstrate an intention that the discussion be specific to the project, not general to all $NO_x$ emissions. A general disclosure that pollutant X may increase health problem Y tends to be encyclopedic, rather than analytic, and, thus, is not particularly meaningful. (Guidelines, § 15006, subd. (o) [paperwork is reduced by preparing analytic rather than encyclopedic EIR's].) Therefore, I interpret the text of the regulation to require information specific to the project.

The next step of regulatory construction is to determine if this textual analysis results in an interpretation that promotes or impairs the purpose of the regulation. In my view, a general statement that $NO_x$ emissions increase respiratory health problems fails to fulfill the purposes of the disclosure requirement. EIR's discuss the relevant specifics of health problems caused by the physical changes resulting from the project to provide "meaningful and useful [information] to decisionmakers and to the public." (§ 21003, subd. (b).) Specifics are "relevant" and "useful" to decisionmakers when they provide a foundation for making a finding or other determination required by CEQA. One determination required of CEQA decisionmakers is the balancing of the anticipated benefits of the project against the various adverse impacts, including the human health problems caused by the project's significant air quality impacts. That balancing is part of deciding whether the benefits override the negative consequences of those health problems and the other adverse environmental impacts. (Guidelines, § 15093 [balancing required before adopting statement of overriding considerations].)

A rational balancing of the benefits of the project against adverse health impacts is achieved only if the information in the EIR gives the decisionmakers some sense of proportion of the health problems that will be caused. Conversely, without some sense of

22

proportion or idea about the weight of the health problems caused by the project's physical changes, the required balancing cannot be completed in a rational manner. A court's inquiry into whether an EIR's discussion of the correlation between air quality impacts and resulting health problems has provided the "relevant specifics" and satisfied Guideline 15126.2(a) must evaluate whether the information provided allows the balancing of the health problems against the project's benefits to be completed in a meaningful way. In sum, an EIR has complied with Guideline 15126.2(a) and disclosed the "relevant specifics" when it provides some sense of proportion about the "changes induced in … health … problems caused by the physical changes" and thereby enables a rationale balancing to occur.

In this case, the general disclosure of the health problems associated with $NO_x$ emission does not provide decisionmakers with any sense of proportion or idea about the weight of the health problems caused by the project's physical changes. With such paltry information, a decisionmaker cannot rationally balance the project's benefits against its detriments when deciding whether or not to approve the project because the weight of the detriment is unknown.

### 3. Summary

In summary, the discussion of the correlation between the project's air pollutant emissions and the health problems that will be caused by those emissions must be project-specific. Therefore, a general disclosure that a pollutant increases respiratory problems lacks the relevant specifics and is legally inadequate. As to identifying the specifics necessary, I believe the appropriate inquiry is whether those specifics give decisionmakers and the public some sense of proportion about how the projects' air pollutant emissions will impact (i.e., induce changes in) health problems. Furthermore, I think Guideline 15126.2(a) can be satisfied without (1) quantifying in percentages or other figures the increase in the risk of particular health problems or (2) estimating the

23

increase in the number of days the area will exceed state or federal standards for criteria air pollutants. In other words, those methods may be acceptable, but are not the only way to comply with Guideline 15126.2(a).

B.    Availability of Information Correlating Air Pollutants to Health Risks

Based on the foregoing interpretation of how to test an EIR's discussion for compliance with Guideline 15126.2(a), I am not convinced that lead agencies and project proponents are incapable of providing specific information that correlates the project's air pollutants to changes induced in health problems.

First, a properly prepared EIR would not leave a reviewing court, the public or decisionmakers in doubt about the capabilities of providing this information. I interpret the regulatory language to mean that, if the drafters of an EIR actually believe they are not capable of presenting correlation information that provides some sense of proportion about health problems, they should disclose that position in the draft EIR. In other words, the draft EIR should state it cannot provide the relevant specifics about the correlation because of "compelling, countervailing considerations." (Guidelines, § 15005, subd. (b).) Then, members of the public inclined to challenge the drafters' position could do so in comments to the draft EIR. In turn, the drafters would have an opportunity to respond. When these steps of the environmental review process are followed, the administrative record will be developed on the question of what information actually can be provided about the correlation. As a result, courts will not be unaided in determining what a lead agency is capable of disclosing about the correlation. In this case, compelling, countervailing considerations were not presented. (See fn. 7, *ante*.)

Second, existing case law illustrates how to provide some sense of proportion about air pollution impacts on health. *Farm Bureau*, a case decided over 25 years ago, involved an EIR that compared the project's emissions to the total regional emissions of

24

certain pollutants. (*Farm Bureau*, *supra*, 221 Cal.App.3d at p. 714.) That information provides a basis for estimating the project's impact on the concentration of the air pollutant, which is how the baseline is described in the instant case. Also, the EIR in *Farm Bureau* estimated the percentage increase in ambient $PM_{10}$ that would be caused by the project. (*Ibid*.) Where, as in the present case, information about concentrations is provided in the description of the baseline air quality, an estimate of the percent increase could be restated in terms of concentration. I recognize such estimates are crude in comparison to the disclosures contained in the diesel particulate health risk assessment of June 11, 2008, which is Appendix 4.2-3 to the EIR. Nonetheless, a decisionmaker with such an estimate is provided with some sense of proportion of the air pollutant impacts, can draw some inferences about health impacts and can use those inference in performing the balancing required before approving the project. If an EIR contained such an estimate and a finding (supported by substantial evidence) that compelling, countervailing considerations prevented a more detailed disclosure about the correlation, I would conclude the disclosure was adequate. (See Guidelines, § 15151 ["sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible"].)

Third, the contents of the administrative record in this case indicate that lead agencies and project proponents are capable of providing a discussion about the correlation of project emissions to the health problems that will be caused by those emissions. Both the city and Wal-Mart point to the diesel particulate health risk assessment (Appendix 4.2-3) as a document that analyzes the health impacts of emissions.[16] It is clear that the document does not address the project's *total* operational

---

[16]     This assessment is based in part on the Air Toxics Hot Spots Program Guidance Manual for Preparation of Health Risk Assessments (Aug. 2003) issued by the Office of Environmental Health Hazard Assessment. The manual states: "There are several air dispersion models that can be used to estimate pollutant concentrations and new ones likely to be developed." The manual also gives the URL for a website maintained by the

emissions. Nevertheless, it demonstrates that a methodology exists for providing specific estimates about the health impacts of air pollutants. For instance, the assessment addresses carcinogenic risks and also contains the results of calculations using a non-cancer hazard index. Tables contain quantifications of carcinogenic risks and noncarcinogenic hazards to nearby residents from exposure to diesel particulate matter under nine-year, 30-year and 70-year scenarios. I do not interpret Guideline 15126.2(a) to mandate this type of *quantification* for all of the project's operational emissions, but think such a disclosure would be adequate if provided. In other words, I do not interpret the correlation requirement as necessarily requiring a quantification of health risks for individuals or at a per-million-person level.

In conclusion, if the disclosure provisions in Guideline 15126.2(a) apply to the project's air pollutant emissions, I would conclude that the EIR's description of the association between the emissions and health problems caused by the emissions fails to comply with Guideline 15126.2(a) and, thus, is legally inadequate.

_____

FRANSON, J.

---

United States Environmental Protection Agency that contains the latest version of the federally recommended models.